UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
NO. 1:16-CR-205-3

| | |
|---|---|
| UNITED STATES OF AMERICA | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE** |
| v. | |
| RONALD KEITH EARNEST | |

The defendant, Ronald Keith Earnest (hereinafter "Mr. Earnest"), submits this Memorandum of Law in support of his Motion to Dismiss the Indictment for failure to state an offense pursuant to Fed. R. Crim. P. 12(b).

## I.     GOOD CAUSE FOR TIMING OF THIS MOTION

Mr. Earnest respectfully requests consideration of this motion pursuant to Fed. R. Crim. P. 12(c)(3), as there is no prejudice to the Government in its consideration, and the delay is not attributable to any oversight by the defense. *See, e.g.*, *United States v. Chavez*, 902 F.2d 259, 263 (4th Cir. 1990) (finding good cause for consideration of untimely motion where tardiness was not due to "negligence, oversight, or laziness" of defense counsel, but instead attributable to the Government). Specifically, on April 12, 2018 - eighteen (18) days before the scheduled jury trial on April 30, 2018, the Government provided notice that it

intended to offer the testimony Financial Institution Examiner Erick Hoffman of the FDIC, and Audit Managers Mickey Jolly and Remonia Felix of the South Carolina Board of Financial Institutions. *See* Gov't Notice of Intent to Offer Test. of State and Fed. Bank Examiners, **ECF# 245**. The Government represented that Mr. Jolly and Ms. Felix will testify as to the 2007 and 2011 BOFI examinations of the entity identified in the superseding indictment as "SC Bank." They will also testify as to the procedures for conducting such examinations generally. Further, they will testify as to the lending limits imposed on SC Bank by state law and regulation, and as to BOFI's role in monitoring and enforcing these lending limits as well as SC Bank's internal lending limits. They will also testify regarding the information necessary for bank examiners to effectively monitor and enforce lending limits, as well as the tools and efforts used by bank examiners to identify loans that should be grouped together for the purposes of lending limits."

*Jenck*'s Act material, which contained the Memorandum of Interview for both Jolly and Felix, was not available for review until April 25, 2018.

After receiving this notice in preparation for trial, defense counsel, attempted to schedule a meeting with Jolly and Felix. According to in-house counsel for the SC Board of Financial Institutions (BOFI), neither Jolly nor Felix were currently under subpoena. Jolly had scheduling conflicts and a pending vacation but made himself available for a conference call with co-defendant

2

counsel James Bannister and Wes Camden on April 27, 2018. The conference call with Mr. Jolly yielded little information as he was unable to procure a copy of the Bank Examination Report and had no independent recollection of the events or his interview with the Government. Ultimately, Ms. Felix made herself available on May 16, 2018. Mr. Jolly made himself available June 8, 2018.

Based on these interviews, defense counsel learned neither Felix nor Jolly would be in a position to offer any opinion testimony. Of particular importance to this motion, these proffered witnesses would not be able to testify regarding the lending limit implications of the factoring transactions at issue in this case.

Specifically, the lending limits applicable to the Bank are a function of South Carolina law contained at both S.C. Code § 34-13-50 (10% or 15%) and S.C. Code § 34-13-70 (25%). The BOFI regulations are contained in Chapter 15 of the State Regulations and contain no guidance or application to lending limits. There is no case law interpreting either of these two state statutes. And, Felix and Jolly will offer no opinion as to how to interpret either of these two statutes. More to the point, Felix and Jolly will offer no opinion as to whether the 10%, 15% or 25% limit applies. Felix and Jolly will offer no opinion as to whether a factoring client is a "direct or indirect borrower" nor will they offer an opinion as to whether the Bank's purchase of accounts receivable from a factoring client falls into the statutory exception to the computation of lending liability limits for "the discount

3

of commercial or business paper" contained in section 34-13-50. "[A] Factoring Agreement . . . traditionally involves the sale of accounts receivable at a discounted price." *Nickey Gregory Co., LLC v. AgriCap*, LLC, 597 F.3d 591, 601 (4th Cir. 2010) (emphasis in original) (internal quotation marks omitted).

After timely conducting extensive research, conducting further interviews, and consulting an expert witness in light of this revelation, grounds for the instant motion became apparent.

The instant motion is filed with good cause attendant to its delay, because the delay is not attributable to negligence, oversight, or laziness. *See Chavez*, 902 F.2d at 263. Further, the Government will not be prejudiced by consideration of this motion, *see United States v. Jones*, 619 F.2d 494, 497 (5th Cir. 1980) ("[T]he court abused its discretion in citing untimeliness as one of two grounds for denying the motion" where "the Government was not prejudiced by any delay in the defendant's attack[.]"), and the interests of judicial economy are not outweighed by the need for consideration of the issues presented herein.

## II.   <u>INTRODUCTION</u>

Based in Greenville, South Carolina, the Bank was founded in 1998 by Mr. Earnest and Mason Garrett. Mr. Earnest served as the President of the Bank from its inception in 1998 until October of 2016. The Bank has five South Carolina branch offices located in Greenville, Fountain Inn, Anderson, Greer, Columbia and

Orangeburg. Under Mr. Earnest's leadership, the Bank grew to have $450 million in assets and employs more than 130 people.

At times relevant to the Superseding Indictment, the Bank maintained and operated a factoring department through which the Bank purchased accounts receivable in a sale transaction. The instant Superseding Indictment contains a facial defect, confounding the Bank's Factoring Agreements with loans.[1] Because the Factoring Agreements constitute true sales of accounts receivable and not loans, the state and federal Legal Lending Limit ("LLL") are inapplicable to the transactions and the Superseding Indictment therefore must be dismissed for failure to state an offense. Even if the federal LLL definitions included purchased accounts through factoring, the state LLL is the governing statute for Bank, not the federal LLL.

## III.   FACTS

The Superseding Indictment, filed August 29, 2017, relies on the Bank breaching the LLL imposed by the FDIC and the South Carolina State Board of Financial Institutions by factoring accounts receivable with various Bank clients. *See* Superseding Indictment dated Aug. 29, 2017, **ECF# 85**. The FDIC LLL does not govern a State Chartered bank. Further, the Superseding Indictment convolutes the concept of a loan agreement versus a factoring agreement. The Government

---

[1] As discussed further below, the term "factoring" itself means the sale of accounts, and not loans secured by accounts. The use of the words "factor" and "factoring" should be accorded their usual definition in the industry. *See* **Exhibit A** – Expert Report of W. Lewis Tabb, III at 13 ("[F]actoring is not lending.").

contends that the Bank provided "loan services . . . including financing based upon borrower receivables known as factoring." *Id*. at 7. The Superseding Indictment further alleges that "[f]actoring receivables is a form of commercial lending . . . In a factoring lending arrangement, the lending bank advances funds or credits to the borrower in some percentage of the amount of the receivables. The lending bank then receives payment directly from the customers of the borrower." *Id*. at 8.[2] Further, the Government alleges that "nominee lending" occurred, whereby the Bank made "loans to a nominal borrower for the benefit of a concealed third party not included in the loan agreements." *Id*. at 7, 35. The Government's conflation between a loan agreement and a factoring agreement is apparent, as the terms are used interchangeably throughout the Superseding Indictment. However, the transactions at issue in this case are all each explicitly termed "Factoring Agreement" and are not lending agreements. *See* **Exhibit B** – Factoring Agreement. Overlooked by the Government, factoring agreements involve the sales of accounts and are not considered loan transactions. "[A] Factoring Agreement . . . traditionally involves the *sale* of accounts receivable at a discounted price." *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 601 (4th Cir. 2010) (emphasis in original) (internal quotation marks omitted). "Factoring is the buying of accounts receivable at a discount." *In re Dryden*

---

[2] The Government's allegation that the Bank received payment directly from customers is in itself sufficient to conclude that the transactions are sales as a matter of law. *See In re Dryden Advisory Grp., LLC*, 534 B.R. 612, 622 (Bankr. M.D. Pa. 2015); *infra* section IV.A.ii.

*Advisory Grp., LLC*, 534 B.R. 612, 620 (Bankr. M.D. Pa. 2015). The transactions at issue are thus, not subject to the LLL as relied upon in the Superseding Indictment.

The transactions constituted sales of accounts, as evidenced by the Bank's Factoring Agreements themselves: "Seller shall sell to Purchaser as absolute owner, with full recourse, such of Seller's Accounts as are listed from time to time on Accounts Transmittal." Factoring Agreement ¶ 2.1.1. The Bank acquired a security interest in the collateral of its factoring clients in UCC-1 forms, but this security interest "secur[ed] the Obligations . . ." *Id*. ¶ 5.1. The "Obligations"[3] were limited to present and future obligations "owing by Seller to Purchaser," and not obligations owing from account debtors to the Bank. *See id*. ¶ 1. Further, the Factoring Agreement states that "[n]otwithstanding the creation of the above security interest, the relationship of the parties shall be that of **Purchaser** and **Seller** of accounts, **and not that of lender and borrower**." *Id*. ¶ 5.2 (emphasis added).

Before factoring any account, the Bank reserved the right to determine account eligibility "in the exercise of its reasonable sole credit or business judgment." *Id*. ¶ 1. Under the Factoring Agreement, the Bank undertook to analyze

---

[3] "It is important to recognize that an advance by the Factor against accounts receivable sold to it by the Client is not an Obligation of the Client but is an advance payment of the Purchase Price of Accounts." **Exhibit A** – Expert Report of W. Lewis Tabb, III at 8-9.

the credit risk associated with account debtors whose accounts a client sought to sell to the Bank. To this end, the Bank required that its client produce documentation supporting and evidencing the accounts that the client sought to sell, such that the Bank would be able to determine the collectability of those accounts before it purchased them. *See id.* ¶ 2.1.2.

The purchase price of the accounts was their face value, less a discount accounting for the Bank's credit risk exposure and a service charge. *See id.* ¶ 1. The service charge was equal to the outstanding balance of advanced funds to the client multiplied by three percent over the Bank's prime rate. *Id.*

After the Bank purchased an account, all account debtors were notified of the sale and assignment, and payment was to be remitted directly to the Bank. *See id.* ¶ 8.3.[4] The Bank thereafter retained the right of primary control over servicing the accounts. *See id.* ¶ 8.1. After written notice, the Bank had sole authority to a) grant extensions of time to pay; b) compromise or settle accounts for less than their face value; c) release any account debtor for the payment of any accounts; and d) grant credits, discounts, allowances, deductions or the like with respect to any of the accounts. Paragraph 7.1 of the Factoring Agreement irrevocably authorized the Bank to "take or bring, in the name of Purchaser or Seller, all steps, actions, suits

---

[4] The required "Notation" reads "This account has been assigned and is payable directly to [the Bank] . . . to whom notice of any claim or dispute must be advised, either in writing or by telephone . . ." Factoring Agreement ¶ 1.

or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts . . ."

The transactions included recourse, as the Bank could require the seller to repurchase an account if a) an account debtor disputed an obligation to pay; b) an event of default occurred or the termination date of the agreement was reached; or c) a purchased account remained unpaid beyond ninety days *Id.* ¶¶ 4.1, 12.1 (defining events of default).

## IV.   ARGUMENT

The Superseding Indictment is facially defective and relies on an erroneous assumption of law that the factoring agreements at issue in this case are loans–they are not.  The factoring agreements at issue in this case are true sales of accounts receivable. "There are numerous points in the Factoring Agreement which support the fact that this is a factoring agreement and not a lending agreement." **Exhibit A** – Expert Report of W. Lewis Tabb, III at 8. The state and federal LLLs are thus inapplicable to the transactions, and the Superseding Indictment therefore must be dismissed for failure to state an offense.

**A.** **The Factoring Agreements are not governed by State or Federal Lending Limits: The Transactions are True Sales of Accounts Receivable and Not Loans**

The state and federal lending limits apply only to "loans". 12 C.F.R. § 32.3; S.C. Code Ann. § 34-13-50. Thus, the Superseding Indictment fails to state an offense as required by Fed. R. Crim. P. 7(c)(1), as it falsely presupposes that the transactions were loans and not sales. Although some courts have characterized factoring agreements as secured loans, analysis of the terms of the Bank's form Factoring Agreement dictates that they are true sale factoring agreements. The agreements are therefore beyond the scope of LLLs as a valid and vital financial transaction for businesses, and small businesses in particular.[5]

Commentators collecting cases on this issue of sale versus loan have been led to conclude that the decisions reveal only a vague standard that a transaction should be characterized according to the intent of the parties indicated by the surrounding facts of the transaction. *See* Robert D. Aicher & William J. Fellerhoff, *Characterization of A Transfer of Receivables As A Sale or A Secured Loan Upon*

---

[5] Factoring allows small companies to obtain capital, particularly companies with the bulk of their assets concentrated in accounts receivable. Large commercial banks prefer to finance against tangible assets that may not exist in smaller companies, particularly in temporary labor contracting companies, because determining the credit risk on accounts receivable in small companies with rudimentary bookkeeping practices can be cumbersome. Factoring allows such companies to sell their accounts receivable in exchange for cash, and further transfers the credit risks and administrative costs of servicing accounts to the factor. *See* **Exhibit A** – Expert Report of W. Lewis Tabb, III at 6-7.

*Bankruptcy of the Transferor*, 65 Aᴍ. Bᴀɴᴋʀ. L.J. 181, 206 (1991); *see also Carter v. Four Seasons Funding Corp.*, 351 Ark. 637, 655 (2003) ("[W]e are persuaded that this issue turns principally on the intent of the parties as well as other attending factors.").

More recent decisions have set forth factors that a court should consider, including 1) whether the buyer has a right of recourse against the seller; 2) whether the seller continues to service the accounts and commingles receipts with its operating funds; 3) whether there was an independent investigation by the buyer of the account debtor; 4) whether the seller has a right to excess collections; 5) whether the seller retains an option to repurchase accounts; 6) whether the buyer can unilaterally alter the pricing terms; 7) whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and 8) the language of the agreement and the conduct of the parties. *In re Dryden*, 534 B.R. at 620; Aicher & Fellerhoff, *supra*.

Strong consideration must be given as to the extent to which the purchaser of accounts has assumed the credit risk associated with the accounts, which can be evidenced by the level of recourse a purchaser has against a seller, and facts indicating that the purchaser undertook to independently analyze creditworthiness of account debtors. *See Nickey Gregory*, 597 F.3d at 601-02; *United Virginia Factors Corp. v. Aetna Cas. & Sur. Co.*, 624 F.2d 814, 816 (4th Cir. 1980);

11

*Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545-46 (3d Cir. 1979). While recourse against a seller is indicative that less credit risk has been transferred such that the transaction looks more like a loan, even "full recourse is not outcome determinative". *Carter*, 351 Ark. at 657-58 (acknowledging that recourse provisions are a point of negotiation between parties to the sale and have a direct impact on the purchase price); *see also Major's Furniture*, 602 F.2d at 545 (noting that guarantees of collectability may be consistent with a true sale factoring agreement).

### i.   The Bank Retained Full Right as to Collection and Settlement of Purchased Accounts, and Account Debtors Were Notified of the Sale

The rights conferred to the Bank with respect to purchased accounts further indicate a true sale. As evidence that true right and title to the accounts had in fact transferred to the Bank pursuant to the Factoring Agreement, the Bank became "absolute owner" of the accounts; it retained the right to service and settle the accounts upon dispute and restrict seller from doing so; it required account payments to be remitted directly to it; and account debtors were notified of the sale.[6] Each of these facts has been held to indicate a true sale rather than a secured

---

[6] Factoring Agreement ¶ 2.1.1 (Bank as absolute owner); ¶ 2.2 (Bank to send invoices and payment to be made directly to Bank); ¶¶ 7.1, 9 (Bank's right to effect collection and realization on accounts); ¶¶ 8.1, 9 (Bank's right to restrict seller from negotiating accounts); ¶ 8.3 (notice to account debtors of sale).

12

loan. The facts and circumstances of the Factoring Agreements at issue therefore support a finding of true sale. *See* **Exhibit A** – Expert Report of W. Lewis Tabb, III at 11-13.

When the purchaser of accounts retains the right to service accounts, *i.e.*, send invoices and make collections, a true sale is indicated. *In re Dryden*, 534 B.R. at 623-24. "The ability of a buyer to demand that it receive payment directly from account debtors supports [a] finding that the transaction is a sale." *Id*. at 622. Moreover, if the exercise of the right to direct payment is exercised or automatic at the inception of a factoring agreement, it is "abundantly clear that the transfer of accounts [is] a sale." *Id*. Finally, notice of the sale and assignment to account debtors indicates a true sale. *See Carter*, 351 Ark. at 658-59; *see also* Reade H. Ryan, Jr., *Trade Receivables Purchases,* DS71 AM. LAW INST.–AM. BAR ASS'N CONTINUING LEGAL EDUC. 305, 373 (1999) ("When the seller retains control over the collection of transferred receivables, the failure to notify account debtors of the transfer is likely to be viewed as a factor contrary to the characterization of the transaction as a sale.")

*In re Dryden* involved a factoring agreement nearly identical to the Bank's Factoring Agreement in the instant case in terms of account servicing and control. *Compare* 534 B.R. at 622-623, *with* Factoring Agreement ¶¶ 2.2, 7.1, 8.1, 8.3, 9. In deciding that the transaction was a true sale of accounts in *In re Dryden*, the court

13

looked to the contract and the conduct of the parties to ascertain who truly owned the accounts: "If receivables are commingled with the seller's general operating funds, a loan rather than a sale is suggested." *Id*. at 622. The court noted that the factor required the seller to "hold in trust and safekeeping, as the property of [factor], and immediately turn over to [factor] the identical check or other form of payment received by [seller], whenever any payment on any Purchase Account comes into [seller's] possession" and held that this was indicative of a true sale. *Id*.

The court next discussed that the ***right*** of the factor to demand direct payment from an account debtor indicated a sale. The contract read in relevant part that "[factor] ***may*** notify any Customer [*i.e.*, account debtor] to make payments directly to [factor] for any Account." *Id*. (emphasis added). The court emphasized that if this right was exercised at the outset, it would have been "abundantly clear" that the transaction constituted a true sale. *Id*.

Though similar, the terms of the Bank's Factoring Agreements in this case are significantly more indicative of a true sale than those at issue in *In re Dryden*. First, the contract at issue in *In re Dryden* allowed the seller to hold purchased account payments in trust for the benefit of the factor. In the instant case, not only was payment required to be made directly to the Bank, Factoring Agreement ¶¶ 2.2, 8.3, the agreement imposed a misdirected payment fee on the seller for any payment on a purchased account that was not redirected to the Bank by the next

14

banking day. *Id.* ¶ 3.2. Thus, not only were account receivables not commingled with the seller's general operating funds, a penalty was imposed on a seller who attempted as much.

Second, *In re Dryden* holds that a sale is indicated whenever a factor ***may*** require payment directly from an account debtor, and that a true sale is abundantly clear when this condition is automatic. The Bank's Factoring Agreements are not conditional in this regard: "All Account Debtors ***will*** be instructed to make payments to [the Bank]." Factoring Agreement ¶ 2.2 (emphasis added). "Before sending any invoice evidencing an Account . . . Seller ***shall*** mark same with the Notation" which reads "[t]his account has been assigned and is payable directly to [the Bank]. *Id.* ¶¶ 1, 8.3 (emphasis added). The Government itself has alleged that payments were made directly to the Bank, Superseding Indictment at 8, thus conceding that the transactions are consistent with true sales and not loans.

The contract at bar far surpasses that in *In re Dryden* insofar as the terms indicating control and notice bear on the issue of true sale treatment. The instant Factoring Agreements should thus be considered true sales with respect to control of the account proceeds as indicia of true transfer of ownership, with the seller disclaiming all interest in collection on the accounts.

### ii. Recourse Does Not Convert the Transactions Into Loans: Guarantees of Collectability are Consistent with a True Sale

The existence of full recourse attendant to the Factoring Agreement is not enough to convert the transaction into a loan in the face of all other facts and circumstances in this case. As a point of negotiation in the sale, the seller has a right to make guarantees with regard to the subject of the transaction in order to obtain a higher purchase price.

If the seller of an account has transferred its entire interest in a receivable, the transfer is a true sale as a matter of law, regardless of any recourse obligations. *In re Dryden*, 534 B.R. at 623. Although some courts accord the existence of recourse significant weight, "[t]he existence of a right of full recourse is not dispositive." *Id.*; *see also United Virginia*, 624 F.2d at 816; *Major's Furniture*, 602 F.2d at 544; *Carter*, 351 Ark. at 657; Aicher & Fellerhoff, *supra* ("[C]ourts have held transfers to be sales even where partial or full recourse existed in addition to other factors which typically suggest a loan."); *see generally* Steven L. Harris, Charles W. Mooney, Jr., *When Is a Dog's Tail Not a Leg?: A Property–Based Methodology for Distinguishing Sales of Receivables From Security Interests That Secure an Obligation*, 82 U. CIN. L. REV. 1029 (2014) (discussing that a more critical factor is whether a seller retains a property interest in the accounts receivable, and not whether the seller has a recourse obligation).

16

The role of recourse was discussed at length in *Carter*, where the Supreme Court of Arkansas held a transaction to be a true sale, despite a finding of full recourse in the event of nonpayment. *See* 351 Ark. at 656-58. The court noted that commerce would suffer if a rule were to be established that sales of financial assets with recourse converted those transactions into loans:

> Such a holding would of course, seriously curtail commerce, and would impair the negotiation and sale of commercial paper. Certainly, negotiable notes and mortgages are the subject of bona fide sales in the usual course of business, and very frequently their sales are at a discount. Probably, most often the sales are with recourse, for many business concerns would not purchase the paper otherwise. We see no reason why an actual and bona fide sale and purchase of paper at a discount should be hampered by the ruling that appellant seeks.

*Id*. at 658 (quoting *Haley v. Greenshaw*, 235 Ark. 481, 486 (1962)).[7] The court acknowledged "it [is] commonplace to include recourse provisions in factor agreements and that recourse ha[s] a direct impact on the sales price." *Id*. at 657. In negotiating the contract for ***sale***, the parties agreed that there would be full recourse: "this resulted in a higher purchase price for the accounts receivable and, thus, more cash to [seller]." *Id*.

In the present transaction, the seller entirely terminated its interest with respect to collection on the purchased accounts, relinquishing control over

---

[7] Commerce would be curtailed because converting sales transactions into loans on the basis of recourse results in the prohibition of a seller from obtaining guarantees during sales negotiations, lest the seller be exposed to the severe penalties associated of usury law applicable only to loans.

servicing and collection to the Bank. The Factoring Agreements should thus be deemed true sales as a matter of law as in *In re Dryden*. The Factoring Agreement does not include any right of the seller to receive payment for amounts collected that exceeded the advanced funds, as would be characteristic of a loan. Notwithstanding this contention, the presence of recourse is still insufficient to overcome all of the attendant facts and circumstances of this case to convert the transaction into a loan. The parties to the Factoring Agreement should be free to negotiate their obligations and reap the benefit of a higher price upon the assumption of a risk without that negotiation subrogating their intent:

> There is no legal or public policy which precludes a transferor from improving the value of an asset sold by adding its own guarantee. When a financial asset represented by a check or other draft is transferred, recourse is the common, accepted, and sometimes mandatory consequence of transfer. Indorsement with recourse has never been viewed as precluding the existence of a sale.

Peter V. Pantaleo *et. al.*, *Rethinking the Role of Recourse in the Sale of Financial Assets*, 52 BUS. LAW. 159, 160 (1996). The transactions should therefore be construed as true sales of accounts receivable, beyond the scope of LLLs as relied on in the Superseding Indictment.

### iii.    **The Bank's Factoring Agreements Expressly Designate the Parties Thereto as Purchaser and Seller of Accounts.**

The express intent of the parties to the Factoring Agreements evinces a true sale of accounts. Consideration must be given to the express language of the Bank's Factoring Agreements. "In the interpretation of any contract, the intent of the parties should always govern." *Progressive Furniture Co. v. Stoneville Furniture Co.*, 192 F.2d 869, 870 (4th Cir. 1951). The contract designates the transaction as a "sale," and the parties are deemed "Purchaser" and "Seller" of accounts. Factoring Agreement ¶ 2.1; *See also* **Exhibit A** – Expert Report of W. Lewis Tabb, III at 7-8 (noting that the language in the Factoring Agreement indicates a sale of accounts and not a loan). The Bank became the "absolute owner" of all accounts purchased. *Id*. The parties explicitly intended that the transaction not be construed as a secured borrowing arrangement, but that notwithstanding a security interest, "the relationship of the parties shall be that of Purchaser and Seller of accounts, and not that of lender and borrower." *Id*. ¶¶ 5.2, 17 ("The relationship of the parties hereto shall be that of Seller and Purchaser of accounts").

*Carter v. Four Seasons Funding Corp.* holds true to fundamental principles of contract interpretation,[8] that the issue of true sale turns "principally on the intent of the parties". 351 Ark. at 655. The express intent of the parties is that of a true sale factoring transaction. While other cases have overridden the intent of the parties to find a secured lending transaction despite the express language of an agreement, these cases are readily distinguishable on their facts, as evidence existed in each of these cases that the parties expressly or impliedly treated the transaction as a loan.

In *Nickey Gregory*, the Fourth Circuit held that a factoring transaction was not a true sale but a secured lending transaction, contrary to the factoring agreement's express language. 597 F.3d at 603. However, the court in that case undertook a closer examination of the transaction's documentation, to discover a "Preliminary Term Sheet," which described the transaction as a ***credit facility*** and designated the parties as ***lender*** and ***borrower*** of the funds. *Id.* at 601. Additionally, the security agreement executed contemporaneously with the factoring agreement referred to the latter as "the Loan Agreement". *Id.* at 602. The

---

[8] *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."). *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63 (2000) ("The primary goal in interpreting contracts is to determine and enforce the parties' intent."); *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821 (1990) ("Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation."); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) ("The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles.").

court thus, concluded that these documents indicated that the accounts were merely held as collateral for repayment of advanced funds, as the parties themselves referred to the transaction as a loan. *Id*.

*Major's Furniture* also held that a sale was not a sale, but rather a secured loan. *See* 602 F.2d 538. In so holding, the Third Circuit first noted that the factor required seller to "retain all conceivable risks", *Id*. at 545, but also that the conduct of the parties directly controverted the document's express language suggesting a true sale transaction: the factor in *Major's Furniture* unilaterally altered the price term of the agreement by imposing a floating interest rate on a new credit limit of $80,000. *Id*. at 546. A letter from the factor to the client discussed the "***principal*** amount financed". *Id*. (emphasis added). The court recognized that in a true sale transaction, these new terms could not be imposed without a writing signed by all parties, and that the parties thus intended the transaction to be a line of credit. *Id*.

Nowhere in the record do such facts exist as they did in *Nickey Gregory* or *Major's Furniture* that would justify subordination of the express language of the Bank's Factoring Agreements. The present documentation is devoid of any reference to the Bank as a lender or the client as a borrower as in *Nickey Gregory*: the contract specifically states that the relationship of the parties ***shall not*** be that of lender and borrower. Factoring Agreement ¶ 5.2. Further, no evidence exists to support the conclusion that the Bank in fact treated the transactions as a credit

facility as in *Major's Furniture*, where the factor imposed interest on "principal". Because the express intent of the parties–evidenced by the language of the Bank's Factoring Agreements–are not overborne by circumstances beyond the documents themselves, the contract must be construed to give effect to that intent.

## V.   CONCLUSION

The Superseding Indictment erroneously states  that the Bank's Factoring Agreements are governed by federal LLLs as a matter of law.  The Superseding Indictment erroneously states that the Bank's Factoring Agreements should be included in the state LLL.  The Superseding Indictment also erronesouly states that the Bank's Factoring Agreements are loans The Government's conclusion to this effect wholly neglects any analysis of the agreements whatever. The intent of the parties–and the complete transfer of ownership and control of purchased accounts– dictate that the transactions constitute true sales of accounts receivable as a matter of law. The Superseding Indictment thus fails to state an offense as required by Fed. R. Crim. P. 7(c)(1), and must be dismissed, as LLLs are inapplicable to these transactions.

Respectfully submitted, this 20th day of September, 2018,

/s/ Joshua B. Howard
Joshua B. Howard, Esq.
NC Bar No. 26902
Gammon, Howard, & Zeszotarski, PLLC
115 ½ West Morgan Street
Raleigh, NC 27601
(919) 521-5878
Fax (919) 882-1898
jhoward@ghz-law.com


/s/ Deborah B. Barbier
Deborah B. Barbier, LLC (#6639)
1811 Pickens Street
Columbia, SC 29201
(803) 445-1032
Fax (803) 445-1036
dbb@deborahbarbier.com

*Attorneys for Defendant Earnest*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d), this brief has been prepared using Microsoft Word, Times New Roman, 14 point typeface. I certify that the brief contains 5,728 words.

/s/ Joshua B. Howard
Counsel for Defendant Earnest

# CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing document through the electronic service function of the Court's electronic filing system:

Frank Joseph Chut, Jr.
Matthew G. T. Martin
Sandra Hairston
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401

Wes J. Camden
Caitlin M. Poe
PO Box 33009
Raleigh, NC 27636-3009

William M. Montague
US Department of Justice
601 D St., NW, 7th Floor
Washington, DC 20004

James W. Bannister
Bannister Wyatt & Stalvey LLC
PO Box 10007
Greenville, SC 29603

Jeffrey A. McLellan
US Department of Justice
Trial Attorney, Tax Division
POB 972
Washington, DC 20044

J. Alexander Heroy
Edward T. Hinson, Jr.
James, McElroy & Diehl, PA
600 South College Street
Suite 3000
Charlotte, NC 28202

Claire J. Rauscher
Thomas R. Ferguson, III
Allen T. O'Rourke
One Wells Fargo Ctr.
301 South College Street
Suite 3500
Charlotte, NC 28202

This the 20th day of September, 2018.

/s/    Joshua B. Howard
Counsel for Defendant Earnest